**LITE DEPALMA GREENBERG & RIVAS, LLC**
Bruce D. Greenberg
Jennifer Sarnelli
Jason E. Macias
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone:     (973) 623-3000
Facsimile:      (973) 623-0858

**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Syverson
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012-3311
Telephone:     (602) 274-1100
Facsimile:      (602) 798-5825

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| RAYMOND ORTIZ, II, on behalf of himself and all others similarly situated,<br><br>　　　　　Plaintiff,<br>v.<br><br>IOVATE HEALTH SCIENCES U.S.A. INC., a Delaware corporation, and IOVATE HEALTH SCIENCES INC., a Canadian corporation,<br><br>　　　　　Defendants. | Civil Action No. _____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]** |

　　　　Plaintiff, Raymond Ortiz, II, residing at 11 Flintlock Drive, Barnegat, New Jersey on behalf of himself and all others similarly situated, by way of Complaint against Defendants Iovate Health Sciences U.S.A., Inc. ("Iovate USA") and Iovate Health Sciences Inc. ("Iovate Canada") says:

## NATURE OF THE ACTION

1. Defendants manufacture, distribute and sell the Hydroxycut line of products (the "Products") in New Jersey and throughout the United States.

2. This is a class action challenging Defendants' practice of affirmatively misrepresenting the safety of the Products, and failing to warn consumers and omitting material facts from their Product packages and advertising regarding the potentially serious adverse health risks associated with consumption of the Products. Plaintiff, on behalf of himself and a class of New Jersey consumers of the Products, seeks actual, treble and punitive damages, disgorgement of profits and/or restitution of the price paid for the Products. In addition, because of the potentially serious and unpredictable health risks associated with consumption of the Products that necessitate periodic diagnostic and medical examinations, Plaintiff seeks equitable relief in the form of medical monitoring.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over this class action under 18 U.S.C. §1332(d), which under the provisions of the Class Action Fairness Act explicitly provides for the original jurisdiction of the federal court in any class action in which any member of the Class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Plaintiff alleges that the total claims of individual class members in this action are well in excess of $5,000,000 in the aggregate, exclusive of interest and costs, and that the total number of members of the proposed Class is greater than 100, as required by 28 U.S.C. § 1332(d)(2), (5). As set forth below, Plaintiff is a citizen of New Jersey, whereas Iovate USA is a citizen of New York and/or Delaware.

4. Venue lies within this District pursuant to 28 U.S.C. § 1391(b)-(c) in that: Defendants Iovate Health Sciences U.S.A., Inc. and Iovate Health Sciences, Inc. conduct business in this District; certain acts giving rise to the claims asserted in this Complaint occurred within this District; the illegal actions of Defendants, as alleged in this Complaint, caused damage to Plaintiff and Class members within this District; and Plaintiff resides within this District.

## THE PARTIES

5. Plaintiff Ortiz is an individual citizen of New Jersey residing at 11 Flintlock Drive, Barnegat, NJ 08005 in Ocean County, New Jersey. During the Class period, Plaintiff Ortiz purchased the Product for personal

consumption, suffered injury in fact and ascertainable loss and has lost money and property as a result of the unlawful, false, misleading and deceptive acts or practices described herein.

6. Defendant Iovate Health Sciences U.S.A., Inc. is a Delaware corporation with its principal place of business in Blasdell, New York. For the purposes of diversity jurisdiction, Iovate USA may be considered a "citizen" of New York and/or Delaware. Defendant Iovate USA is responsible for the distribution of the Products to consumers throughout the United States, including thousands of consumers in New Jersey.

7. Defendant Iovate Health Services, Inc. is a Canadian corporation with its principal place of business in Oakville, Ontario, Canada. Defendant Iovate Canada is responsible for research, development, production and manufacture of the Products.

8. Defendants Iovate Canada and Iovate USA shall be referred to collectively as "Defendants" or "Iovate."

9. Plaintiff is informed and believes, and thus alleges, that at all times herein mentioned, each of the Defendants was the agent, employee, representative, partner, joint ventures, and/or alter ego of the other Defendant and, in doing the things alleged herein, was acting within the course and scope of such agency, employment, representation, on behalf of such partnership or joint venture, and/or as such alter ego, with the authority, permission, consent, and/or ratification of the other Defendants.

## THE MARKETING OF HYDROXYCUT

## HYDROXYCUT WAS NOT FOUND TO BE SAFE OR EFFECTIVE PRIOR TO ITS INTRODUCTION INTO THE MARKETPLACE

10. Hydroxycut is considered a "Dietary Supplement." As such, it is governed by the Dietary Supplement Health Education Act ("DSHEA") and not the Food, Drug and Cosmetic Act.

11. The import of DSHEA was to let Dietary Supplement manufacturers, such as Defendants, get their supplements onto store shelves and to market Dietary Supplements with minimal FDA regulation.

12. In accomplishing this purpose, DSHEA does two things. The first is to exempt dietary supplements, such as Hydroxycut, from expensive pre-market approval processes that prescription drugs are subjected to prior to FDA approval. 21 U.S.C. § 343(r)(6).

13. The second is that it permits the makers of dietary supplements to make claims as to how their supplement affects the structure or function of the body without first conducting clinical studies that demonstrate these claims or gaining prior FDA approval before making them. A supplement manufacturer can make claims about the way its supplement affects the structure or function of the body so long as:

(a) The statement claims a benefit related to a classical nutrient deficiency or disease;

(b) The manufacturer has substantiation that the statement is truthful and not misleading; and,

(c) The statement contains following disclaimer: "**This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease**".

21 U.S.C. § 342 and 343.

14. The FDA cannot issue an injunction or any other penalty in order to regulate dietary supplements. The burden of proof requires that the FDA substantiate its claims before it takes regulatory action. 21 U.S.C. § 342 and 343.

15. There is no verification by the FDA that Dietary Supplements are safe and effective and that the structure and function claims are true. Dietary Supplements can get to the marketplace very quickly and cheaply compared with prescription drugs taken for the same physical condition. It is therefore incumbent upon manufacturers, such as these Defendants, to ensure that their products are safe and effective and to alert consumers when a safety signal is presented.

16. Defendants manufacture and distribute a line of dietary supplements under the Hydroxycut brand name. The fourteen (14) Products that are the subject of this Complaint include: Hydroxycut Regular Rapid Release Caplets, Hydroxycut Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max Liquid Caplets, Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets, Hydroxycut Hardcore Drink Packets (Ignition Stix), Hydroxycut Max Drink Packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs (Ready-to-Drink), Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control and Hydroxycut Natural. (hereinafter referred to collectively as the "Products").

17. Defendants represent that in 2008 they sold approximately 9 million units of the Products in New Jersey and throughout the United States in grocery stores, health food stores and pharmacies.

18.     These Products are designed as "dietary supplements for weight loss as fat burners, energy enhancers, as low carb[ohydrate] diet aids and to promote water loss." FTS-HHS FDA, "*Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,*" Transcript dated May 1, 2009 at p. 1 (Exhibit A, attached hereto).

19.     Defendants marketed their Products as the "the right choice for fast weight loss" and represented that the Products are made of "all natural" ingredients that are "research-proven" to work effectively. The Products' packaging promotes their use to "increase energy," "burn calories" and "control appetite." Specifically, the Products' packaging states:

> "Hydroxycut® is America's #1 selling weight-loss supplement. Hydroxycut really does work - fast! Utilizing sophisticated Rapid-Release Caplets, Hydroxycut is doctor formulated with clinically proven ingredients to help you lose up to 4.5 times the weight than diet and exercise alone. Now with an improved HydroxyTea® blend, there's even more reason to love Hydroxycut®."

20.     The Products' packaging also states: "[d]on't take chances - you deserve the best! Put your trust in the power of Hydroxycut® and discover for yourself why millions of men and women all across America have used Hydroxycut. For fast weight loss, make Hydroxycut® your #1 choice today!"

21.     The Products' packaging emphasizes that the Products are "doctor formulated" and approved. In this regard, the Products' packaging boasts that the Products are "Backed by Science" and includes a picture of Dr. John Marshall, D.O., "Resident Physician," and his statement that "Hydroxycut® is a product that has ingredients proven to work. I've recommended it to a number of men and women and have used it myself with fantastic results." The Products' packaging also credits Dr. Marvin Heuer, FAAFP, Iovate's Chief Scientific Officer, with formulating the Products.

22.     Defendant Iovate USA provided written notification to the FDA that the representations Defendants made regarding the safety and efficacy of the Products were "truthful and not misleading," when in fact they knew the contrary to be true. *See, e.g.*, Iovate USA letter to FDA, dated January 18, 2006 regarding Hydroxycut Hardcore (Exhibit B).

## DEFENDANTS' UNLAWFUL CONDUCT

23. In truth, Defendants misrepresented the safety of their Products. Defendants failed to inform consumers, and omitted material facts from the Products' labeling and packaging, regarding the potentially serious adverse health risks associated with use of the Products, including Rhabdomyolysis (muscle damage that can lead to kidney failure and other health problems), death, cardiovascular symptoms, hypertension, elevated liver enzymes that can indicate liver failure, kidney failure and seizures, jaundice, brown urine, nausea, vomiting, light colored stool, unusual tiredness, weakness, stomach or abdominal pain, unexplained itching and loss of appetite.

24. Consumers have experienced one or more of these potentially serious adverse health risks after consuming the Products. The FDA is currently aware of 23 reported cases of adverse liver effects experienced by consumers of the Products, including asymptomatic blood liver enzyme changes, jaundice, liver damage, liver transplant and death. FTS-HHS FDA, "*Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,*" Transcript dated May 1, 2009 at p. 2.

25. In addition, the FDA is aware of four case reports in the medical literature involving sick patients who had consumed the Products and were diagnosed with serious liver disease. FTS-HHS FDA, "*Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,*" Transcript dated May 1, 2009 at p. 2.

26. Because of the reported incidents of serious liver damage and other potentially serious adverse health risks associated with consumption of the Products, on May 1, 2009, the FDA "strongly advise[d]" consumers of "the potential risk of severe liver injury" associated with consumption of the Products and to discontinue use of all the Products. FTS-HHS FDA, "*Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,*" Transcript dated May 1, 2009 at p. 2.

27. Specifically, the FDA's announcement stated:

> The FDA has received 23 reports of serious health problems ranging from jaundice and elevated liver enzymes, an indicator of potential liver injury, to liver damage requiring liver transplant. One death due to liver failure has been reported to the FDA. Other health problems reported include seizures; cardiovascular disorders; and rhabdomoyolysis, a type of muscle damage that can lead to other serious health problems such as kidney failure.
>
> Liver injury, although rare, was reported by patients at the doses of Hydroxycut recommended on the bottle. Symptoms of liver injury include jaundice (yellowing of the skin or whites of the eyes) and brown urine. Other symptoms include nausea, vomiting, light-

colored stools, excessive fatigue, weakness stomach or abdominal pain, itching, and loss of appetite.

"The FDA urges consumers to discontinue use of Hydroxycut products in order to avoid any undue risk. Adverse events are rare, but exist. Consumers should consult a physician or other health care professional if they are experiencing symptoms possibly associated with these products," said Linda Katz, M.D., interim chief medical officer of the FDA's Center for Food Safety and Applied Nutrition.

28. Defendants' Products contain proprietary blends of overlapping ingredients that are associated with the serious adverse health risks caused by these Products. Because each Product contains a "blend" of ingredients, it is extremely difficult to isolate the specific ingredients which cause the harm. As noted by the FDA, the "reaction is idiosyncratic," meaning that it is "not [] predictable, [there] does not appear to be [a] dose response relationship between taking [a] specific amount or taking access amount or taking it for a long versus a short duration of time or that there are any specific risk factors. Most of the individuals in which we've had an adverse event report[] have normal liver functions and were otherwise healthy individuals before we started to get a report." FTS-HHS FDA, "*Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,*" Transcript dated May 1, 2009 at p. 11.

29. As the manufacturer and distributor of the Products, Defendants possess specialized knowledge regarding the content and effects of the "proprietary blend" of ingredients contained in the Products and are in superior positions to learn of the effects and have learned through the adverse event reports and other sources of the harmful effects their Products will have on consumers.

30. Defendants are aware that there are other products used for weight loss and as dietary supplements that do not present the same potential adverse health risks.

31. Defendants' misrepresentations of the Products' safety and failure to warn consumers of the potentially serious adverse health risks of the Products has caused injury to Plaintiff and Class members entitling them to actual damages, treble damages, punitive damages and to equitable relief in the form of disgorgement of Defendants' profits and full restitution of all monies paid for the Products. Had Plaintiff and Class members known of the potential serious side effects associated with consumption of the Products they would not have purchased them.

32. In addition, because the potential serious health risks posed by the Products' proprietary blend of overlapping ingredients are not predictable, Plaintiff and Class members will require periodic diagnostic and medical examinations. Thus, Plaintiff and Class members also are entitled to equitable relief in the form of medical monitoring including, *inter alia*, funding to: notify all Class members of the potential health risks associated with use of the Products; study the long-term effects of the Products; gather and forward information to treating physicians for diagnosis and treatment; aid in early diagnosis and treatment; and pay for diagnosis and preventative medical treatment.

## PLAINTIFFS' EXPERIENCES

33. Plaintiff Ortiz purchased Hydroxycut between 2003-2005 for approximately $20-30 per package.

34. Prior to purchasing the Product, Plaintiff Ortiz read the packages and relied on the representations contained on the Product package.

35. Plaintiff Ortiz consumed the Hydroxycut capsules as directed.

36. Plaintiff Ortiz purchased and consumed the Product believing it was reasonably safe as a dietary supplement and for weight-loss purposes. Plaintiff did not know the Product posed serious adverse health risks including Rhabdomyolysis (muscle damage that can lead to kidney failure and other health problems), death, cardiovascular symptoms, hypertension, elevated liver enzymes that can indicate liver failure, kidney failure and seizures, jaundice, brown urine, nausea, vomiting, light colored stool, unusual tiredness, weakness, stomach or abdominal pain, unexplained itching and loss of appetite.

37. After consuming the Product as directed, Plaintiff Ortiz suffered various adverse symptoms including nausea, headaches, rapid heartbeat and shortness of breath.

38. On or about May 17, 2009, Plaintiff Ortiz learned of the potential serious health risks caused by the Products, stopped consuming the Products and will no longer purchase them.

39. Plaintiff Ortiz has suffered injury in fact and ascertainable loss and lost money and property as a result of the alleged conduct. He has been injured in the amount paid for the Product because had he known of the potential health risks he would not have purchased the Product. Plaintiff also has been injured in that he will require periodic diagnostic and medical examinations to ensure he either has not suffered any physical harm from his consumption of the Products or, if harmed, he receives proper treatment.

## EQUITABLE TOLLING

40. Defendants have affirmatively and wrongfully concealed their unlawful, false, misleading and deceptive acts or practices from Plaintiff and Class members including misrepresenting the safety of the Products and failing to warn consumers and omitting material facts from their labeling and advertising regarding the potentially serious adverse health risks associated with consumption of the Products. Plaintiff and other Class members did not know and could not reasonably have known of unlawful, false, misleading and deceptive acts or practices, nor could they have reasonably discovered the same until after the FDA's May 1, 2009 public announcement.

41. There is a substantial nexus between the wrongful conduct that has occurred within the statute of limitations and the misconduct prior to that time. The same safety misrepresentations and material adverse health risk omissions are at issue.

42. The statute of limitations applicable to any claim brought by Plaintiff or other Class members as a result of the conduct alleged herein has been tolled as a result of Defendants' concealment.

## CLASS ALLEGATIONS

43. Plaintiff brings this action on his own behalf and as a Class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

> All New Jersey residents who purchased any of the Hydroxycut Products within the applicable limitations period.[1]

44. Excluded from the Class are Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which the Defendants have a controlling interest or which is related to or affiliated with the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded party.

45. Plaintiff and the members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impractical.

---

[1] The "Hydroxycut Products" include: Hydroxycut Regular Rapid Release Caplets, Hydroxycut Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max Liquid Caplets, Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets, Hydroxycut Hardcore Drink Packets (Ignition Stix), Hydroxycut Max Drink Packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs (Ready-to-Drink), Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control and Hydroxycut Natural.

46. Plaintiff's claims are typical of the claims of the members of the Class. The named Plaintiff is a member of the Class of victims described herein.

47. The named Plaintiff is willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with, the interests of the other members of the Class.

48. The interests of the named Class representative are co-extensive with, and not antagonistic to, those of the absent Class members. The proposed representative will undertake to represent and protect the interests of the absent Class members.

49. The named Plaintiff has engaged the services of counsel indicated below. Said counsel are experienced in complex class litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent the named Class representative and absent Class members.

50. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

51. This action involves questions of law and fact common to Plaintiff and all Class members concerning violations of New Jersey's Consumer Fraud Act, common law fraud and unjust enrichment. These common questions predominate over any issues affecting individual members of the Class and include:

(a) Whether the Products had potentially serious adverse health risks when used as directed;

(b) Whether Defendants engaged in unlawful, false, misleading and deceptive acts or practices by misrepresenting the safety of the Products and/or by failing to warn consumers of the potentially serious adverse health risks associated with consumption of the Products;

(c) Whether Plaintiff and Class members have been injured by Defendants' misrepresentations and/or failure to warn of the potentially serious adverse health risks associated with consumption of the Products;

(d) Whether Defendants have been unjustly enriched by their fraudulent, unfair or deceptive acts or practices;

(e) Whether Plaintiff and Class members are entitled to actual damages in the amount paid for the Products, treble damages and/or punitive damages;

(f) Whether Plaintiff and Class members are entitled to disgorgement or Defendants' profits and/or restitution of the monies they paid to purchase the Products; and

(g) Whether Plaintiffs and Class members are entitled to equitable relief in the form of medical monitoring.

52. Judicial determination of the common legal and factual issues essential to this case is far more efficient and economical as a class action than in piecemeal individual determinations.

53. There is no plain, speedy or adequate remedy other than by maintenance of this lawsuit as a class action because individual damages are relatively small, making it economically infeasible for Class members to pursue remedies individually. The prosecution of separate actions by individual members of the Class, even if theoretically possible, would create a risk of inconsistent or varying adjudications with respect to individual Class members against Defendants and would establish incompatible standards of conduct for Defendants.

54. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) given the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendants committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when Defendants' liability has been adjudicated, claims of all Class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

(d) without a class action, many Class members would continue to suffer injury, and Defendants' violations of law will continue without redress while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct.

55. Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

56. This action also is appropriately certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to all members of the Class and final injunctive relief is appropriate to the Class as a whole.

57. Plaintiff seeks equitable relief on behalf of the entire Class on grounds generally applicable to the entire Class.

58. In addition, Plaintiff seeks actual, treble and/or punitive damages, to the extent available.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT,**
**N.J.S.A. 56:8-1,** *ET SEQ.*

59. Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

60. This cause of action is brought under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*. (the "Act"). At all relevant times, Defendants were and are "persons," as defined by N.J.S.A. 56:8-1(d). Defendants' Products are "merchandise" within the scope of the Act.

61. The Act prohibits unlawful practices, which are defined to include unconscionable practices, deception, fraud, false pretenses, false promises, misrepresentations or the knowing, concealment, suppression, or omission of material facts.

62. Defendants' unlawful, false, misleading and deceptive acts or practices were made in connection with the advertisement and sale of merchandise within the scope of the Act.

63. Defendants misrepresented the safety of the Products and failed to warn consumers of the Products' potentially serious adverse health risks in their advertising, marketing materials and on the Products' packaging.

64. As the manufacturer and distributor of the Products, Defendants possess specialized knowledge regarding the content and effects of the "proprietary blend" of ingredients contained in the Products and are in superior positions to learn of the effects and have learned of the harmful effects their Products will have on consumers. This information was not known by or available to the public. Further, this information was not widely disseminated among Defendants' employees but was known only to higher level employees within the Companies that had reason to know of such information. As a result, Defendants knew, should have had reason to know, or recklessly disregarded that their representations were false and misleading.

65. Defendants' misrepresentation of the Products' safety and failure to warn consumers of the potentially serious adverse health risks associated with consumption of the Products in their advertising, marketing materials and on the Products' packaging had the capacity to and did, deceive Plaintiff and Class members into purchasing the Products.

66. Plaintiff and all Class members purchased Defendants' Products in packages that uniformly misrepresented their safety and/or knowingly omitted material facts including that the Products pose potentially serious adverse health risks and the nature of those risks.

67. Neither Plaintiff nor any of the Class members knew about or were privy to any information about the potential health risks posed by Defendants' Products at the time they purchased the Products.

68. Plaintiff and Class members read the representations on the Product packages, as well as Defendants' advertising and marketing materials in purchasing the Products.

69. Plaintiff and Class members have been actually injured and have suffered an ascertainable loss of money proximately caused by Defendants' unlawful, false, misleading and deceptive acts or practices in the approximate amount they paid for each of Defendants' Products.

70. Plaintiff and Class members also are entitled to equitable relief in the form of full restitution of all monies paid for Defendants' Products and disgorgement of the profits Defendants received from sales of the Products.

71. Because Defendants' unlawful, false, misleading and deceptive acts or practices have exposed Plaintiff and Class members to potentially serious health risks that, because of their unpredictability as alleged above, necessitate periodic diagnostic and medical examinations, Plaintiff and Class members also are entitled to equitable relief in the form of medical monitoring that provides for the establishment of a fund to: notify all Class members of the potential health risks associated with use of the Products; study the long-term effects of the Products; gather and forward information to treating physicians for diagnosis and treatment; aid in early diagnosis and treatment; and pay for diagnosis and preventative medical treatment.

72. Plaintiff is entitled to an award of attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## COMMON LAW FRAUD

73. Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

74. Defendants misrepresented the safety of the Products and failed to warn consumers of the Products' potentially serious adverse health risks in their advertising, marketing materials and on the Products' packaging.

75. As the manufacturer and distributor of the Products, Defendants possess specialized knowledge regarding the content and effects of the "proprietary blend" of ingredients contained in the Products and are in superior positions to learn of the effects and have learned of the harmful effects their Products will have on consumers. This information was not known by or available to the public. Further, this information was not widely disseminated among Defendants' employees but was known only to higher level employees within the Companies that had reason to know of such information. As a result, Defendants knew or should have had reason to know that their representations were false and their material omissions were misleading.

76. Defendants' misrepresentation of the Products' safety and failure to warn consumers of the potentially serious adverse health risks associated with consumption of the Products in their advertising, marketing materials and on the Products' packaging was intended to, had the capacity to and did, induce Plaintiff and Class members into purchasing the Products.

77. Plaintiff and all Class members purchased Defendants' Products in packages that misrepresented the safety and/or uniformly omitted material facts including that the Products pose potentially serious adverse health risks and the nature of those risks.

78. Neither Plaintiff nor any of the Class members knew or were privy to any information about the potential health risks posed by Defendants' Products at the time they purchased the Products.

79. Plaintiff and Class members read and reasonably relied on the accuracy of the representations on the Product packages, as well as Defendants' advertising and marketing materials in purchasing the Products.

80. Plaintiff and Class members have been actually injured and have suffered an ascertainable loss of money proximately caused by Defendants' fraudulent conduct in the approximate amount they paid for each of Defendants' Products.

81. Defendants' unlawful and deceptive conduct was knowing, deliberate, wanton, reckless and malicious, and undertaken in conscious disregard of, and reckless indifference to, Plaintiff's interests, and otherwise of a character warranting punitive damages. The gravity of Defendants' alleged wrongful conduct outweighs any purported benefits attributable to such conduct. There also were reasonably available alternative dietary and weight-loss formulations that Defendants could have manufactured and distributed that did not have the same potentially serious adverse health risks.

82. Plaintiff and Class members therefore are entitled to actual damages in the amount of the price they paid for the Products.

83. Plaintiff and Class members also are entitled to disgorgement of the profits Defendants received from the sale of the Products.

84. Because Defendants' unlawful, false, misleading and deceptive acts or practices have exposed Plaintiff and Class members to potentially serious health risks which, because of their unpredictability as alleged above, necessitate periodic diagnostic and medical examinations, Plaintiff and Class members also are entitled to equitable relief in the form of medical monitoring that provides for the establishment of a fund to: notify all Class members of the potential health risks associated with use of the Products; study the long-term effects of the Products; gather and forward information to treating physicians for diagnosis and treatment; aid in early diagnosis and treatment; and pay for diagnosis and preventative medical treatment.

85. Plaintiff is entitled to an award of attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### NEW JERSEY PRODUCTS LIABILITY ACT - FAILURE TO WARN

86. Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

87. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the Hydroxycut line of products and, in the course of same, directly advertised or marketed the product to consumers, or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of the Products.

88. Defendants failed to adequately warn the public, including Plaintiff Raymond Ortiz, II and Class members, of the true risks of the Products.

89. The Products were under the exclusive control of Defendants and were unaccompanied by appropriate warnings of the inherent risks.

90. Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Products. Had they done so, no consumer, including Plaintiff Raymond Ortiz, II, would have purchased and/or used the Products.

91. The Products, researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendants, were defective due to inadequate after market warnings and/or instruction because, after Defendants knew or should have known that there was reasonable evidence of risks associated with the use of the Products Defendants failed to provide adequate warnings to the consuming public, including Plaintiff and Class members and instead continued to aggressively promote the Products.

92. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members suffered serious and permanent non-economic and economic injuries.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT

93. Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

94. Plaintiff and Class members conferred a benefit on Defendants by purchasing the Products.

95. Defendants appreciated and/or realized the benefits in the amount of the profits they earned from sales of the Products to Plaintiff and Class members.

96. Defendants have profited from their unlawful, false, misleading and deceptive acts or practices at the expense of Plaintiff and Class members, under circumstances in which it would be inequitable for Defendants to be permitted to retain the benefit.

97. Plaintiff does not have an adequate remedy at law against Defendants.

98. Plaintiff and Class members are entitled to disgorgement of the profits revenue derived from the sale of the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

A. Certifying this action as a plaintiff class action as set forth above;

B. Awarding actual damages in the amount paid for the Products and/or treble damages;

C. Awarding Plaintiff treble or punitive damages;

D. Awarding Plaintiff and Class members equitable relief in the form of restitution of all monies paid for the Products, disgorgement of Defendants' profits from sales of the Products, and establishing a fund for medical monitoring;

E. Awarding Plaintiff pre-judgment and post-judgment interest as provided by law;

F. Awarding Plaintiff attorneys' fees and costs; and

G. Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 20, 2009

**LITE DEPALMA GREENBERG & RIVAS, LLC**

/s/ Bruce D. Greenberg
Bruce Greenberg
Jennifer Sarnelli
Jason E. Macias
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone:  (973) 623-3000
Facsimile:  (973) 623-0858

**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Syverson
2901 N. Central Avenue, Suite 1000
Phoenix, Arizona 85012-3311
Telephone: 602-274-1100
Facsimile: 602-798-5860

*Attorneys for Plaintiffs*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is related to the cases on the attached list. Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: May 20, 2009

**LITE DePALMA GREENBERG & RIVAS, LLC**

By: /s/ Bruce D. Greenberg
Bruce D. Greenberg
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

# RELATED CASES

Kafka v. Iovate Health Sciences, Inc., et al.
    NJDC  - Civil Action No. 09-2163

Rossi v. Iovate Health Sciences U.S.A., Inc., et al.
    PAWDC – Civil Action No. 09-0612

Coleman v. Iovate Health Sciences, Inc.
    CASDC – Civil Action No. 09-0988

Shortridge v. Iovate Health Sciences U.S.A., Inc., et al
    AZDC – Civil Action No. 09-1009

Williams v. Iovate Health Health Sciences, Inc., et al.
    CASDC – Civil Action No. 09-1020

Baker v. MuscleTech Research and Development, Inc., et al.
    ALNDC – Civil Action No. 09-0872

Davis v. Iovate Health Sciences U.S.A., Inc., et al
    ALNDC – Civil Action No. 09-0896

Public Patent Foundation, Inc. v. Iovate Health Science Research, Inc., et al.
    NYSDC – Civil Action No. 09-4361

Lopez v. Iovate Health Sciences, Inc.
    CASDC – Civil Action No. 09-0002

Pennier v. Iovate Health Sciences U.S.A., Inc., et al
    LAEDC – Civil Action No. 09-3533

Chancellor v. Iovate Health Sciences U.S.A., Inc., et al
    ALMDC – Civil Action No. 09-0438

Faherty v. Iovate Health Sciences U.S.A., Inc., et al
    MADC – Civil Action No. 09-10732